## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| STEVEN A. CLARK, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.14-cv-3069 |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant, | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Steven A. Clark, Jr., appeals from the denial of his application for Social Security Disability Insurance Benefits and Supplemental Security Income (collectively "Disability Benefits") under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423, 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Clark has filed a Brief in Support of Motion for Summary Judgment (d/e 10), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 15).  The matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be affirmed.

## STATEMENT OF FACTS

Clark was born on June 18, 1977.  Clark completed two years of college and received an Associate's degree in computer technology.  Clark last worked in October 2009 as a kitchen manager in a senior center. Before that, he worked as a driver for a Meals-on-Wheels program, a pizza delivery person, a nurse's aide, housekeeper, and dietary worker at a Veteran's home, and a stocker at a retail store.   Clark alleged that he became disabled on October 13, 2009.  Clark amended his alleged onset of disability date to November 15, 2009.  Clark suffers from major depressive disorder, left S-1 radiculopathy, and chronic low back pain with disc bulge and nerve root encroachment.  Certified Transcript of Record of Proceedings before the Social Security Administration (d/e 8) (R.), at 16, 18, 40, 41, 42, 64, 72.

On February 25, 2010, Clark went to see Dr. Anuj More, M.D., complaining of back pain.  R. 293-94.  Clark had injured his back at work two years earlier and recently reinjured it picking up a four-year old child. Dr. More sent Clark to the emergency room for further evaluation.  R. 294, 303-10.  The doctor at the emergency room ordered X-rays of his lumbar spine, which were taken.  The X-rays showed no acute bony abnormality or significant degenerative change.  R. 311.

On March 1, 2010, Clark saw Dr. More.  R. 291-92.  Dr. More prescribed pain medication and ordered X-rays of the thoracic and lumbar spine.  The X-rays showed anatomic alignment and no fractures.  R. 312. Dr. More saw Clark several times in March 2010 to adjust his pain medications.  Dr. More prescribed physical therapy.  Dr. More also diagnosed Clark with depression during this period and prescribed antidepressants.  R. 278-90.

On March 30, 2010, an MRI of Clark's lumbar spine showed degenerative changes at L5-S1 with narrowing and desiccation; a small to moderate disk protrusion central to the left, displacing the subarticular portion of the left S1 nerve root.  The right root did not appear affected. R. 320.

On April 5, 2010, Clark was evaluated for physical therapy.  R. 323-27.  Clark rated his pain at rest as 6 out of 10, and his pain during activities as 10 out of 10.  R. 324.  The therapist noted that Clark was "independent with ADLs and gait."  R. 324.[1]  Clark had limited range of motion in his lumbar spine.  Clark had normal muscle tone and reduced strength in his lower extremities.  R. 325.

---

[1] The term ADLs refers to "activities of daily living."

Clark saw Dr. More on April 8, 2010.  At that time, Dr. More referred Clark to a pain management clinic.  R. 278.

On April 16, 2010, Clark went to see pain specialist Dr. Linh Thuy Nguyen, M.D.  Dr. Nguyen noted that Clark could walk, climb one flight of stairs, and lift ten pounds occasionally.  Dr. Nguyen noted "Unable to work." Dr. Nguyen gave Clark a Function Ability Score of 45.  The ALJ interpreted this score as a Global Assessment of Functioning (GAF) score.  R. 23. Dr. Nguyen offered epidural injections, but Clark declined.  R. 334. Dr. Nguyen recommended changing Clark's medication to take him off benzodiazepine (Valium and Dilaudid) and substitute Percocet or Lortab, but Clark declined and left.  R. 334, 338.

On April 21, 2010, Clark saw Dr. More again.  Clark reported that he left the appointment at the pain management clinic early.  Clark reported that his pain was getting better.  Clark reported that his antidepressant medication was helping; he reported that his mood had improved and he was feeling more hopeful.  R. 271.  On examination, Clark had normal muscle strength, normal sensory examination, and normal examination of his extremities.  R. 272.

On April 22, and 27, 2010, Clark protectively filed his applications for

Disability Benefits.  Clark alleged that his disability began on October 13,

2009.  R. 16.

On June 11, 2010, Clark saw Dr. Nguyen again.  Clark reported that

he had stopped taking Dilaudid and Valium.  Clark was taking Aleve

instead.  Dr. Nguyen administered an epidural steroid injection in his

lumbar spine.  R. 346.

Later on June 11, 2010, Clark saw psychologist Dr. Frank Froman,

Ed.D., for a consultative examination.  R. 295-97.  Dr. Froman assessed

Clark with a major depressive disorder—moderate in severity.  He gave

Clark a GAF score of 56.  Dr. Froman concluded, in part:

> **CONCLUSIONS**:  Steven's back has truly compromised his
> psychological functioning.  Were it not for this, he would easily
> be able to perform one or two step assemblies at a competitive
> rate.  He is still able to relate adequately to others, understand
> oral and written instructions and manage benefits.  He is able to
> withstand whatever form of work his body will allow him to
> perform.
>
> That said, he has worked intensively with others, and is
> continuing his search for better quality pain management,
> hoping ultimately to be able to return to a level of functioning
> that he can now not enjoy.

R. 297 (emphasis in the original).

On August 21, 2010, Clark saw Dr. Raymond Leung, M.D., for a

consultative examination.  R. 366-71.  Clark reported that he had low back

pain.  Clark reported that the epidural injection and the physical therapy helped some with his back pain.  Dr. Leung reported that Clark did not use a cane.  Dr. Leung reported that Clark walked with a mild to moderate limp.  Clark's gait was slightly slow.  Clark could walk fifty feet unassisted.  Clark could tandem walk, heel walk, and toe walk.  Clark refused to attempt to hop or squat.  Clark had decreased range of motion in his lumbar spine.  Straight leg testing was positive bilaterally.  Dr. Leung observed no spasms or atrophy.  Clark had normal strength in his extremities.  R. 366-68.

On September 7, 2010, Dr. Lenore Gonzalez, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 372-79. Dr. Gonzalez opined that Clark could lift twenty pounds occasionally and ten pounds frequently; could stand and/or walk for six hours in an eight-hour workday; could sit for six hours in an eight-hour workday; and should never climb ladders, ropes, or scaffolds.  Dr. Gonzalez opined that Clark had no other physical functional limitations.  R. 372-79.

On October 12, 2010, Clark saw Nurse Practitioner Julie Barry, CNP, complaining of back pain.  On examination, Clark had full range of motion in his extremities; his gait was steady and unassisted; his low back was tender to palpitation; and straight leg testing was positive.  Clark's left leg was weaker than his right.  Clark exhibited pain in all directions with

movement of the lumbar spine.  R. 386-87, 392-93.  Barry planned to change his medications and refer him to a pain clinic.  R. 387, 393-94.

On December 11, 2010, Clark completed a Function Report—Adult form.  R. 228-35.  Clark reported that he was in constant pain.  He reported that he did not cook because he could not stand or lift.  He reported that he loaded the dishwasher and put away clothes at his home, but these activities took a long time because he had to rest every five minutes.  He reported that his fiancé did most of the housework and cooking.  He testified that he had difficulty dressing himself.  He reported that he did not drive because of his medications.  He went to the grocery store once a week with his fiancé.  He leaned on the cart to walk around the store.  He reported that his back pain and depression affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs.  His condition also affected his memory and concentration, and his ability to complete tasks and to get along with others.  Clark opined that he could walk half a block before he would need to rest for thirty minutes.  Clark reported that he could not pay attention because of his pain medications.  Clark reported that he followed written instructions "very well," but not oral instructions because his medications affected his memory.  Clark reported that he used

a cane to walk.  Clark reported that the cane was prescribed in December 2010.  R. 228-35.

On January 20, 2011, Clark saw Barry for continued back pain.  Clark reported having muscle spasms.  Barry observed that Clark's gait was steady.  Barry also observed that Clark was using a cane.  Barry prescribed Cymbalta.  R. 399, 500.

On January 28, 2011, agency physician Dr. Henry Rohs, M.D., R. 395-97 completed an Illinois Request for Medical Advice form.  R. 395-97.  Dr. Rohs reviewed the medical records and reaffirmed Dr. Gonzalez's opinions recorded on the September 7, 2010, Physical Residual Functional Capacity Assessment.  R. 396.

On February 9, 2011, Clark saw licensed clinical social worker Claudia Lasys for an individual therapy session.  Lasys noted that Clark was "minimally motivated with this process."  Lasys gave Clark a GAF score of 50.  Lasys noted, "The patient does look as though he has succumbed to his level of pain, that he is very focused on this level of pain, his inability to physically get around or to do much.  Unfortunately, this young man has isolated himself on many levels."  R. 401.

On February 18, 2011, Clark saw Dr. Nguyen.  Dr. Nguyen noted that epidural steroid injections helped temporarily, but Clark's pain returned.

Dr. Nguyen prescribed water therapy and pain medications.  R. 402.

On March 16, 2011, Clark saw Lasys again for a counselling session.
Clark reported that he did not do well with his prescription for Cymbalta.
Clark presented with a depressed mood.  R. 503.

On March 17, 2011, Clark saw Dr. Nguyen.  Clark reported that his
pain remained the same.  He was taking Percocet and ibuprofen.  Clark
reported that he wanted to have surgery, but no one would perform surgery
because he did not have insurance.  R. 422.  Dr. Nguyen administered an
epidural steroid injection in Clark's lumbar spine.  Dr. Nguyen noted,

> I think with this particular gentleman I have done procedures,
> very aggressive epidural steroid injection, and also pain
> medications and really he has not improved at all.  He does
> have a herniated disc, but what it looks like on the MRI and
> what his symptoms are do not correlate.  I think there is a lack
> of motivation as well.  It is really hard to say, but he just does
> not push herself (sic) as much as I would like to see him help
> himself.
>
> He is also applying for disability so that could be a part of the
> problem as well.
>
> I think we really need to have him see a neurosurgeon to see if
> this something that can be surgically fixed. . . .  At this rate, had
> not been doing any better since he has been here.  He is just
> going be miserable, but I do not know how to change that at all.
> We really have been working hard with him.  One visit he could
> be really good, doing well and active and the next could be
> horrible.  I think a lot of that is his mood.  He does not do much
> as far as activities so I do not think that there is activity that is
> causing discomfort.  I think it is lack of activity and his
> depression that is currently not under control.

R. 424.

On March 30, 2011, Clark saw Lasys.  Lasys noted, in part,

MENTAL STATUS:  Patient presented in session and it looks
like he is getting around a little bit better with his cane.  His
affect is much brighter, not so restricted.  He is pleasant and
cooperative during our session.  He indicates that depression
waxes and wanes, although his pain has been reportedly at 3-4
on a scale of 1-10, which is dramatically decreased.

R. 433.

On March 15, 2011, Clark's fiancé Meliss A. Shields completed a

questionnaire.  Shields reported that she had lived with Clark for six years.

Shields reported that Clark was in constant pain.  She reported that he was

unable to sleep because of the pain.  She said he used a cane to help with

his balance.  She stated that he could walk for five to ten minutes, stand for

five minutes, and sit for an hour.  She opined that he could lift three to four

pounds with one hand and seven to eight pounds with both hands.  She

reported that Clark could bathe himself and care for his personal hygiene,

but activities such as bathing took longer than normal because of the pain.

R. 248-49.  She stated the Clark was "constantly irritable and depressed

and tends to be short with people."  R. 249.

On March 15, 2011, Clark's mother Shirley Clark completed a

questionnaire.  R. 252-54.  Clark's mother stated that Clark could not work

because of severe depression and pain.  She stated that he had pain in his back, hips, and legs.  She stated that Clark was "very moody" because of the pain.  R. 252.  She stated that he used a cane to walk.  She opined that Clark could walk for five minutes, stand for five minutes and sit for five minutes at a time.  She opined that Clark could lift five pounds with one hand and ten pounds with both hands.  She stated that Clark had difficulty getting in and out of the bathtub and up from sitting on a toilet.  R. 253. Clark's mother stated that Clark was irritable and sometimes lashed out. R. 254.

On May 26, 2011 Clark again saw Barry.  Clark reported that he "got into it with the Pain Clinic" and stopped taking the pain medication prescribed by Dr. Nguyen.  Clark was only taking ibuprofen or Aleve.  Barry noted that Clark walked with a cane.  His gait was steady and upright. R. 441.

On June 22, 2011, Clark again saw Lasys.  Clark reported that he had a consult appointment with a neurosurgeon.  Lasys noted that Clark "offered no concerns with regard to depression or anxiety at this point in time."  R. 442.  Lasys further noted, "Otherwise, patient appears to be holding his own in terms of mood management and pain management as well."  R. 442.

On July 28, 2011, Clark again saw Barry. Clark reported that his back was the same. Clark was only taking ibuprofen for pain. Clark continued to use a cane to walk. Clark reported difficulty sleeping. Clark reported that he slept one to two hours at a time. Barry prescribed fluoxetine and baclofen. R. 443.

On September 8, 2011, Clark saw Barry again. Clark reported less muscle cramping. Clark's mood was improved. Clark reported that he was able to fall asleep, but his pain kept waking him up. Clark continued to use a cane for walking. Barry scheduled Clark for a neurological examination. R. 511.

On November 8, 2011, Clark saw Barry again. Clark reported that he was doing better because his family situation improved. He reported that he had more pain, but was "dealing with it." He was taking ibuprofen and baclofen for pain and muscle spasms. He was taking doxepin as needed to help him sleep. R. 446.

On November 10, 2011, Clark underwent EMG and nerve conductions studies of his back. The studies showed left S1 radiculopathy "which appears to be subacute and chronic." The tests showed no evidence of mononeuropathy, lumbosacral plexopathy, or peripheral neuropathy. R. 477, 547.

On January 18, 2012, Clark saw Barry again.  Clark reported increased pain in his left leg, and numbness and tingling in his right leg.  On examination, Clark's right and upper lumbar spine was tender to palpitation.  Straight leg testing was positive at 30 degrees on the left and at 60 degrees on the right.  Clark had pain with bending forward, left and backward.  Barry observed tightness along the musculature on the right side of the lumbar spine.  Clark was using a cane "somewhat for ambulation."  R. 515.

On January 20, 2012, Clark underwent an MRI of his lumbar spine.  The findings were mild disk disease at the L5-S1 level, unchanged from the last MRI.  R. 544.  The radiologist also noted that a small left paracentral disk protrusion abutted the S1 nerve root, but did not compress it.  The radiologist found normal spacing from T12 to L5.  R. 544.

On January 26, 2012, Clark went to the emergency room complaining of back pain.  He rated the pain as 10 out of 10.  On examination, the emergency doctor found "no joint pain, swelling, warmth, erythema, stiffness.  No muscle spasm or fasciculations."  Clark was given prescriptions for prednisone and hydrocodone.  R. 555, 561.

On February 1, 2012, Clark saw Barry for back pain.  Clark reported increased back pain on the left side of his back down to his left buttock.

Clark also reported increased pain at the center of the lumbar spine.  On

examination, Clark was tender with palpitations on his lumbar spine.

Straight leg testing was positive.  Barry prescribed Diclofenac in place of

ibuprofen, and told Clark that he could continue taking hydrocodone for

pain.  Barry advised Clark on the use of heat and ice.  Barry also offered

physical therapy, which Clark declined.  R. 561.

On February 9, 2012, Clark saw Barry.  Clark reported that he was

having less pain, but still had some tenderness.  R. 563.

On March 7, 2012, Clark saw Barry.  Clark reported that his back pain

was somewhat better.  Clark used a cane for walking.  Barry noted that

Clark's posture was more upright and steady.  Clark reported that he was

scheduled to receive an epidural steroid injection in the near future.

R. 565.

On May 23, 2012, Clark saw Barry.  Clark reported that he received

the epidural steroid injections on April 25, 2012.  Clark reported that the

injection did not relieve his pain.  His pain increased over the past week.

He rated his pain at 7 out of 10.  Barry noted that Clark's condition had

"been found to be nonsurgical."  R. 567.

On July 5, 2012, Clark saw Barry.  Clark reported that "he has been

pretty good."  Clark rated his pain at 6 out of 10.  Barry noted, "He is using

a cane for ambulation.  Gait is steady.  He exhibits full strength in his lower extremities."  R. 525.

On August 8, 2012, Clark saw a neurosurgeon, Dr. Todd McCall, M.D., for a surgical consultation.  Dr. McCall noted that Clark had an antalgic gait and used a cane.  Dr. McCall said that Clark had full range of motion in all extremities, neck, and lumbar spine.  Dr. McCall stated that Clark's MRI scan showed some degenerative changes in his spine, some arthritis, some disk bulging, but no clear nerve compression.  Dr. McCall opined that Clark was not a good candidate for back surgery.  Dr. McCall stated that he did not see "any surgical pathology at this time with his spine."  R. 533.  Dr. McCall ordered a bone scan to identify any arthritis "that we may be able to treat with conservative treatments."  R. 533.

On August 15, 2012, Clark underwent a bone scan and whole body scan.  The scan was largely normal, with "minimal degenerative change at the knee with increased activity."  R. 543.  The radiologist noted, "There is no focal increased activity within the lumbar spine to account for the patient's back pain."  R. 543.  Clark saw Barry after the bone scan on the same day, August 15, 2012.  Barry noted that the neurosurgeon opined that Clark's condition was nonsurgical.  On examination, Barry noted that

Clark's gait was "upright, steady and unassisted."  Barry reduced Clark's use of hydrocodone and added Tramadol for pain.  R. 527.

On August 16, 2012, the Administrative Law Judge (ALJ) held an evidentiary hearing.  R. 35-72.  Clark appeared in person and with his attorney.  Vocational expert Dr. Jeffrey Magrowski, Ph.D., also appeared by telephone.  R. 37-38; see R. 106-08.  The ALJ left the record open to August 30, 2012, to allow Clark to submit additional material.  R. 39.

Clark testified first.  He was divorced.  He lived with his fiancé.  He had two sons, ages 14 and 10.  His sons did not live with him.  R. 41.

Clark testified that he had constant stabbing pain in his back.  Clark testified that the slightest activity aggravated his pain.  He testified that he could sit in a chair for five minutes before he needed to shift positions.  He testified that he could stand for two minutes.  He testified that Dr. More recommended using a cane because Clark was experiencing falls.  Clark testified that he had been falling because he had pain in his legs and weakness in his knees.  Clark testified that he could walk for two minutes.  Clark testified that he had to shift positions constantly between sitting, standing and lying down.  R. 43-44.  Clark testified that he lay down two-thirds of the time.  R. 44.

Clark testified that he had no medical insurance.  He testified that he could receive water treatment and surgery if he had insurance.  R. 44-45.

Clark testified that he experienced muscle spasms five to six times a day.  He experienced spasms with the "slightest of activities or sometimes no activity at all."  R. 45.  Clark testified that he had the spasms in his lower back.  He testified that the spasms lasted for hours.  R. 45.

Clark testified that his pain ran down his legs "through my buttocks down to the back of my knees."  R. 45.  The pain in the left leg was worse than the right.  Clark testified that he felt more numbness in his right leg. Clark described the pain in his left leg as "intense pain, shooting down to the back of my knee."  R. 46.  Clark testified that he could lift a couple of pounds.  He testified that his cane was the heaviest thing he could pick up on a regular basis.  R. 46.

Clark testified that he took hydrocodone and Tramadol for the pain.[2] The medications took "the edge off the pain."  R. 46.  A few hours after taking the medication, the pain became bearable, but still constant.  Clark testified that the hydrocodone caused confusion, forgetfulness, drowsiness, and nausea.  R. 46.  Clark testified that he regularly napped for twenty to

---

[2] The brand name medication Vicodin contains hydrocodone.

thirty minutes beginning some time from 4:00 p.m. to 5:00 p.m.  Clark did not drive because of the medications, pain, and muscle spasms.  R. 47.

Clark testified that the pain caused depression, "Well, it's it's robbed me of the life I used to have.  I, I can't do things with my children like I used to.  I can't support my family like I used.  It just, it's caused some serious depression."  R. 47.

Clark testified that he took Amitriptyline and Doxepin to help him sleep.  He said that the medication allowed him to sleep five hours a night.  He testified that he could not sleep longer than five hours a night because of his pain.  Clark testified that the medication made him feel groggy in the morning.  R. 48.

Clark testified that he could not bend at the waist or squat because of his pain.  He avoided climbing stairs because he previously fell down stairs.  He testified that he was afraid; he hurt too much when he fell down the stairs.  R. 48.

The ALJ asked Clark why he walked out of the session with Dr. Nguyen in April 2010.  Clark testified that he thought the session was just for an initial consultation, but Dr. Nguyen immediately wanted to give him the epidural injection.  He testified that he was not expecting the injection and he got scared.  R. 49-50.

Clark testified that he had had a total of five epidural steroid injections.  He testified that the injections helped with stiffness in his back.  He testified that the effects of the injections only lasted about a month.  R. 50.  Clark testified that he currently reduced his pain medications to two Vicodin a day.  R. 50.

Clark testified that he used to walk for exercise three times a week, but he stopped in the summer of 2011 because, "It just became too hard for me."  R. 50.  Clark testified that currently he walked, "Maybe five minutes here, two minutes there."  R. 51.  Clark testified that he also exercised ten minutes a day.  He performed back stretching exercises that his doctors gave him.  R. 51.

Clark testified that he did not leave the house.  He left the house for a haircut a week and a half before the hearing.  He left the house three weeks before the hearing to go to his mother's house.  Otherwise, Clark testified that he stayed home.  R. 52.

The ALJ asked Clark why he had money for cigarettes, but not for water therapy.  Clark testified that he did not buy his cigarettes and that he did not have the money to pay for water therapy.  R. 54.

The ALJ asked Clark about Dr. Nguyen's March 17, 2011, note, quoted above, in which Dr. Nguyen stated that the symptoms did not

correlate with the MRI and that Clark lacked motivation and did not push

himself.  Clark responded, "I believe she expected more out of me, Your

Honor, than I could give."  R. 54.

The ALJ asked Clark about his consult with Dr. McCall.  Clark

responded, "He told me that based on my financial situation there was

nothing he could do for me and they just did a bone scan, he ordered a

bone scan for me, and he's thinking that it could be arthritis."  R. 55.

The ALJ asked Clark about Lasys' March 30, 2011, note that Clark's

pain was "dramatically decreased" and was a 3-4 on a scale of 1-10.  The

ALJ asked,

> Q . . . Your pain has dramatically decreased they indicated.
> No?  Yes?".
>
>  A    No, Sir.
>
> Q    So, they're trying to report what you told them.  So, did—
> are they reporting it wrong?
>
> A    I have good days and bad days.  It could be that that was
> on a good day.

R. 55-56.

The ALJ asked Clark about his use of a cane.  Clark testified that the

cane helped with his balance.  The ALJ asked whether Clark received a

prescription for the cane.  Clark responded that Dr. More recommended

that he use a cane or an umbrella.

The ALJ asked Clark about his college attendance.  Clark testified that he could only take one class at a time because he could not stand to stay for a second class because of the pain.  Clark testified that he was allowed to bring a pillow to class and to lie down during classes in the back of the classroom.  Clark testified that he was able to take notes, conduct research, and complete assigned homework.  R. 62-63, 65.

Vocational expert Magrowski then testified.  Magrowski testified to the categories of jobs listed in the Department of Labor's Dictionary of Occupational Titles which corresponded to Clark's prior work.  R.65-67. The ALJ asked Magrowski the following hypothetical question:

> Hypothetical one, assume an individual of the claimant's age, education and work experience who is limited to the full range of light exertional work, as defined in the regulations, limited to frequent climbing of ramps and stairs; no climbing of ladders, ropers or scaffolds; occasional balancing; frequent stooping; occasional kneeling, crouching and crawling.  Such an individual must avoid moderate exposure to hazards, such as operational control of moving machinery and unprotected heights.  Such an individual is limited to simple routine and repetitive tasks and limited to no more than occasional changes in the work setting with no production rate or pace work, that is no strict or fast paced production requirements, although competitive production requirements would still exist and limited to no interaction with the public.  Could such an individual return to any of the past work you testified to?

R. 67.

Magrowski opined that such a person could perform the

housekeeping job that Clark performed at the Veteran's home.  R. 64.

Magrowski opined that such a person could also perform the additional jobs

of a racker of bakery products, 200 such jobs in the area, and 15,000 in the

national economy; bagger of garments or clothing, 1,000 such jobs in the

area, and 50,000 in the national economy; and laundry worker, 1,000 such

jobs in the area, and over 20,000 in the national economy.  R. 68.

Magrowski testified that the jobs to which he opined were a sample of the

jobs that a person described in the hypothetical question could perform.

R. 68.

## THE DECISION OF THE ALJ

The ALJ issued his decision on October 22, 2012.  R. 16-29.  The

ALJ followed the five-step analysis set forth in Social Security

Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.

Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.  20 C.F.R. §§

404.1520(c), 416.920(c).  If true, Step 3 requires a determination of

whether the claimant is so severely impaired that he is disabled regardless

of his age, education and work experience.  20 C.F.R. §§ 404.1520(d),

416.920(d).  To meet this requirement at Step 3, the claimant's condition

must meet or be equal to the criteria of one of the impairments specified in

20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§

404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the

ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work

considering his age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step; the Commissioner must

show that, considering the listed factors, the claimant can perform some

type of gainful employment that exists in the national economy.  20 C.F.R.

§§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569

(7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352

(7th Cir. 2005).

The ALJ found that Clark met his burden at Steps 1 and 2.  Clark had not engaged in substantial gainful activity since November 15, 2009, and Clark had severe impairments from major depressive disorder, left S-1 radiculopathy, chronic low back pain with disc bulge and nerve root encroachment.  R. 18.  At Step 3, the ALJ found that Clark did not have an impairment or combination of impairments that met or medically equaled a Listing.  R. 19

At Step 4, the ALJ found that Clark had the RFC to perform light work, except that he was limited to:  frequent climbing of ramps and stairs; no climbing of ladders, ropes, and scaffolds; occasional balancing, kneeling, crouching, and crawling; frequent stooping; moderate exposure to hazards such as operational control of moving machinery and unprotected heights; simple, routine, repetitive tasks; occasional changes in the work setting; no production rate or pace work; and no interaction with the public. R. 21.  The ALJ relied on the MRIs, x-rays, EMG and nerve conduction study, and the bone scan that showed relatively mild back problems; the treatment notes by Dr. Nguyen about lack of effort; Clark's report to Lasys in March 2011 that his pain had lessened; the lack of significant psychiatric treatment (only a few sessions with licensed clinical social worker Lasys); Dr. Froman's opinion; Dr. Leung's examination; and the opinions of Drs.

Gonzalez and Rohs in formulating the RFC.[3]  The ALJ found greater restrictions on positional activities of balancing, kneeling, crouching, and crawling than those found by Drs. Gonzalez and Rohs.  R. 27.

The ALJ found that Clark's testimony about the severity of his pain was not credible because it was not consistent with this medical evidence.  R. 25-26.  The ALJ also rejected the written statements by Clark's girlfriend and mother about his activities.  The ALJ found that their opinions about Clark's functional abilities were not well supported by the other evidence in the record.  R. 27.

At Step 4, the ALJ found that Clark could not return to his prior work.  The ALJ relied on the RFC determination and the testimony of vocational expert Magrowski.  R. 27-28.

At Step 5, the ALJ found that Clark could perform a significant number of jobs that existed in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the testimony of Magrowski.  The ALJ found that Clark could perform the representative jobs of bakery racker, bagger, and laundry worker.  R. 28-29.  The ALJ, therefore, found at Step 5 that Clark was not disabled.  R. 29.

---

[3] The ALJ did not refer to Drs. Gonzalez and Rohs by name.  Rather, he referred to them as State Agency Physicians and cited the reference numbers to their reports in the record, 8F and 11F.  R. 27.

Clark appealed.  On January 8, 2014, the Appeals Council denied

Clark's request for review.  The decision of the ALJ then became the final

decision of the Commissioner.  R. 1.  Clark then brought this action for

judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine

whether it is supported by substantial evidence.  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate"

to support the decision.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence, and may not substitute its judgment.  <u>Delgado v. Bowen</u>, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility

determinations of the ALJ unless the determinations lack any explanation

or support in the record.  <u>Elder v. Astrue</u>, 529 F.3d 408, 413-14 (7th Cir.

2008).  The ALJ must articulate at least minimally his analysis of all

relevant evidence.  <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).

The ALJ must "build an accurate and logical bridge from the evidence to his

conclusion."  <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000).

The decision of the ALJ is supported by substantial evidence.  The

RFC determination is supported by the MRI, x-rays, EMG and nerve

conduction study; and bone scan that showed a condition that would

normally be consistent with RFC determination.  The RFC is also supported

by the statements by Dr. Nguyen that Clark was not trying and by Clark's

statement to Lasys that his pain was at a 3-4 on a scale of 1-10.  The RFC

is also supported by the opinions of Drs. Gonzalez and Rohs, and by the

consultative examinations of Drs. Leung and Froman.

Clark argues that the ALJ's findings were not detailed enough and

failed to consider all the relevant evidence.  The Court disagrees.  The ALJ

is not required to mention every piece of evidence in detail.  Rather, he

must build a logical bridge from the evidence to his conclusions.  Simila v.

Astrue, 573 F.3d 503, 516 (7th Cir. 2009).  The ALJ did so.  The RFC

finding was supported by substantial evidence.

Clark also argues that the ALJ stated that he gave weight to

Dr. Froman's opinions, but ignored comments by Dr. Froman that

supported a finding of disability.  As quoted above, Dr. Froman concluded,

in part, "Steven's back has truly compromised his psychological

functioning.  Were it not for this, he would easily be able to perform one or

two step assemblies at a competitive rate. . . .  He is able to withstand

whatever form of work his body will allow him to perform."  R. 297.  Clark

focuses Dr. Froman's first statement that Clark's back problems "truly

compromised his psychological functioning."  The last sentence of his

conclusion, however, opined that Clark could "withstand whatever form of

work his body will allow him to perform."  R. 297.  The ALJ properly relied

on this final conclusion from Dr. Froman that Clark could do any job his

body would allow him to perform.  The ALJ, therefore, relied on the

psychologist, Dr. Froman, for the conclusion that Clark psychologically

could withstand such work.  The ALJ properly looked to the medical

evidence to determine the type of work that Clark could perform physically.

The ALJ further limited the RFC to reflect some psychological limitations

noted by Dr. Froman.  The ALJ did not err in his consideration of

Dr. Froman's opinions.

Clark argues that the ALJ erred in his credibility determination.  The

Court again disagrees.  This Court will not review the credibility

determinations of the ALJ unless the determinations lack any explanation

or support in the record.  Elder v. Astrue, 529 F.3d at 413-14.  This case is

fundamentally about Clark's credibility.  The ALJ disbelieved his claims

about the debilitating level of his pain.  The ALJ cited extensive evidence to

support his conclusion.  The ALJ cited the MRIs, x-rays, the EMG and

nerve conduction study, and the bone scan that showed a condition that

would not normally cause the claimed level of pain.  R. 23-25.  The ALJ

cited Dr. Leung's examination that showed that Clark would walk

unassisted and had normal strength and range of motion in his extremities.

R. 24.  The ALJ cited Dr. Nguyen's observations that the results of the

MRIs did not correlate with Clark's claims of pain.  R. 24.  The ALJ cited the

fact that Clark reported to Lasys that his pain was dramatically decreased

in March 2011 to a 3-4 out of 10.  R. 24.  The ALJ cited Dr. McCall's

surgical consultation results in which he observed full strength and range of

motions in all Clark's extremities.  The ALJ also cited Dr. McCall's

conclusion that Clark did not have any surgical pathology.  R. 25.[4]  The ALJ

also cited Dr. Froman's opinion that Clark could stand the psychological

stress and requirements of work.  R. 24-26.  The ALJ supported his

credibility finding with evidence in the record.  The Court will not disturb this

finding.

Lastly, Clark argues that the ALJ erred by not giving any weight to

Dr. Nguyen's notes from Clark's initial visit that Clark could lift ten pounds

occasionally, had a GAF of 45, and could not work.  The Court sees no

error.  Dr. Nguyen's statement that Clark could lift ten pounds occasionally

and could not work reflected the information Clark provided at the initial

---

[4] Clark testified that Dr. McCall did not recommend surgery because of Clark's finances.  R. 55.  This testimony is inconsistent with Dr. McCall's notes.  The notes state that Clark was not a good candidate for back surgery because Dr. McCall did not find any surgical pathology.  R. 533.  Dr. McCall's notes do not support the contention that Clark's lack of insurance affected Dr. McCall's decision to recommend against back surgery.

visit, not an assessment by Dr. Nguyen.  Dr. Nguyen's later comments on
March 17, 2011, about Clark's condition, quoted above on pages 9 and 10,
far more accurately reflected Dr. Nguyen's opinions as a treating physician.
See 20 C.F.R. §404.1527(c)(2)(i) ([T]he longer a treating source has
treated you . . . the more weight we will give to the source's medical
opinion).  The ALJ considered and gave weight to these assessments.
See R. 24.

The ALJ also did not err in failing to give weight to Dr. Nguyen's GAF
Score of 45.  R. 334.[5]  The ALJ did not ignore the GAF score.  The ALJ
noted that Dr. Nguyen gave Clark a GAF score of 45.  Dr. Nguyen,
however, is a pain management expert, not a psychiatrist or other mental
health care professional.  The record contains no evidence to indicate that
he was qualified to render opinions on Clark's mental health.  A doctor's
area of specialization is a factor in giving weight to his opinions.  See 20
C.F.R. § 404.1527(c)(5) (more weight given to opinions given about issues
within the area of specialty).

---

[5] It is unclear that Dr. Nguyen was giving a GAF score used by psychologists and psychiatrists.  Dr.
Nguyen referred to a "Functional Ability Score" of 45.  R. 433.  Dr. Nguyen did not refer to "GAF" or
"Global Assessment of Functioning" score.  Dr. Nguyen may have been giving some other assessment
score.  The ALJ, however, treated the score as a GAF score.  R. 23.  Clark does not dispute the ALJ's
conclusion that Dr. Nguyen was assessing a GAF score.  See Clark Brief, at 6.

A GAF score also does not reflect a clinician's opinion of functional capacity.  Rather, the score is an assessment of both severity of symptoms and functional capacity.  The final score "reflects the worst of the two." Denton v. Astrue, 596 F.3d 419, (7th Cir. 2010) (quoting American Psychiatric Association (APA), Diagnostic and Statistical Manual of Mental Disorders (Text Revision, 4th ed. 2000) (DSM-4), at 32-34.  The GAF score, therefore, may or may not indicate a person's functional limitations.  Id.

The ambiguity inherent in the GAF score may explain the APA's decision to drop the GAF score from its current diagnostic manual, the DSM-5,

> It was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.

APA, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5), at 16.  Given the conceptual lack of clarity in the GAF score, the Court sees no error in the ALJ's decision not to consider a GAF score given by a pain management specialist rather than a mental health specialist. The ALJ, furthermore, did not ignore Dr. Nguyen.  The ALJ gave weight to Dr. Nguyen's observations in March 2011 made after several sessions with Clark.  R. 24.  The Court sees no error.

THEREFORE, this Court recommends that Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 15) should be ALLOWED, and the Plaintiff's Brief in Support of Motion for Summary Judgment (d/e 10) should be DENIED.  The decision of the Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  <u>See</u> <u>Video Views, Inc. v. Studio 21, Ltd.</u>, 797 F.2d 538, 539 (7th Cir. 1986).  <u>See</u> <u>Local Rule</u> 72.2.


ENTER:  October 19, 2015


_____*s/ Tom Schanzle-Haskins*_____
UNITED STATES MAGISTRATE JUDGE