E-FILED
Friday, 19 February, 2016  04:51:09 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| STEVEN A. CLARK, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-3069 |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE:**

Plaintiff Steven A. Clark, Jr., appeals from the denial of his application for Social Security Disability Insurance Benefits and Supplemental Security Income.  See 42 U.S.C. §§ 405(g), 416(i), 423, 1381a, and 1382c, 1383(c).

On October 19, 2015, United States Magistrate Judge Tom Schanzle-Haskins issued a Report and Recommendation (d/e 17) recommending that this Court deny Clark's motion for summary judgment (d/e 10), grant Defendant's motion for summary affirmance (d/e 15), and affirm the Commissioner's decision. Clark

has filed Objections to the Report and Recommendation (d/e 18), and Defendant has filed a response to the objections (d/e 19).

Having reviewed the record and the pleadings, the Court agrees with the Magistrate Judge that the Administrative Law Judge's (ALJ) decision was supported by substantial evidence. Clark's Objections to the Magistrate Judge's Report and Recommendation (d/e 18) are DENIED. This Court ADOPTS the Magistrate Judge's Report and Recommendation (d/e 17) in full. Clark's motion for summary judgment (d/e 10) is DENIED, and Defendant's motion for summary affirmance (d/e 15) is GRANTED. The decision of the Commissioner is AFFIRMED.

## I.    Legal Standard

Pursuant to Federal Rule of Civil Procedure 72(b)(3), the Court assesses "de novo any part of the magistrate judge's disposition that has been properly objected to." Although the Court need not conduct a new hearing on the entire matter, the Court must give "fresh consideration to those issues to which specific objections have been made." 12 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure  § 3070.2 (2d ed. 1997);

<u>Sigite v. Colvin</u>, No. 13-3140, 2015 U.S. Dist. LEXIS 53805, *2 (C.D. Ill. Apr. 24, 2015) (Myerscough, J.).

If no objection is made, or if only a partial objection is made, the Court reviews for clear error the portions of the disposition to which no objection has been made. <u>Johnson v. Zema Sys. Corp.</u>, 170 F. 3d 734, 739 (7th Cir. 1999). This Court may "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

## II.  Background facts

The Court adopts the factual findings made by Magistrate Judge Schanzle-Haskins and repeats the key findings here.

### A.  Clark's background and medical history

Clark was born in 1977. He completed two years of college and received an Associate's degree in computer technology. He last worked in October 2009 as a kitchen manager in a senior center. Before that, Clark worked as a driver for a Meals-on-Wheels program, as a pizza delivery person, as a nurse's aide, as a housekeeper and dietary worker at a veterans' home, and as a stocker at a retail store.

Clark alleges that he became disabled on November 15, 2009, and that he suffers from major depressive disorder, left S-1 radiculopathy, and chronic low back pain with disc bulge and nerve root encroachment.  Certified Transcript of Record of Proceedings before the Social Security Administration (d/e 8) (R.), at 16, 18, 40, 41, 42, 64, 72.

On February 25, 2010, Clark complained of back pain to Dr. Anuj More, M.D.  R. 293-94.  Clark had injured his back at work two years earlier and had recently reinjured it lifting a four-year-old child.  Dr. More sent Clark to the emergency room for further evaluation.  R. 294, 303-10.  The emergency room doctor ordered X-rays of his lumbar spine.  The X-rays showed no acute bony abnormality or significant degenerative damage.  R. 311.

On March 1, 2010, Clark saw Dr. More again.  R. 291-92.  Dr. More prescribed pain medication and ordered X-rays of Clark's thoracic and lumbar spine.  The X-rays showed anatomic alignment and no fractures.  R. 312.  Over the course of several visits in March 2010, Dr. More adjusted Clark's pain medications, prescribed physical therapy, and diagnosed Clark with depression and prescribed antidepressants.  R. 278-90.

On March 30, 2010, an MRI of Clark's lumbar spine showed degeneration and a small-to-moderate disk protrusion.  R. 320.

At a physical therapy evaluation on April 5, 2010, Clark rated his pain at rest as 6 out of 10, and his pain during activities as 10 out of 10.  R. 323-27.  The therapist noted that Clark was "independent" with respect to gait and to the activities of daily living (ADLs), that Clark had limited range of motion in his lumbar spine, and that Clark had normal muscle tone and reduced strength in his lower extremities.  R. 324-25.

On April 16, 2010, after being referred by Dr. More to a pain management clinic (R. 278), Clark saw a pain specialist, Dr. Linh Thuy Nguyen, M.D.  Dr. Nguyen noted that Clark could walk, climb one flight of stairs, and lift ten pounds occasionally.  Dr. Nguyen noted, "Unable to work."  Dr. Nguyen gave Clark a Function Ability Score of 45.  The ALJ interpreted this score as a Global Assessment of Functioning (GAF) score.  R. 23.  Dr. Nguyen offered epidural injections, but Clark declined.  R. 334.  Dr. Nguyen recommended changing Clark's medication from benzodiazepine (Valium and Dilaudid) to Percocet or Lortab, but Clark declined and left.  R. 334, 338.

On April 21, 2010, Clark saw Dr. More again.  Clark explained that he had left his appointment at the pain management clinic early.  He reported that his pain was getting better, that his antidepressant medication was helping, that his mood had improved, and that he was feeling more hopeful.  R. 271.  On examination, Dr. More determined that Clark had normal muscle strength, normal sensory examination, and normal examination of his extremities.  R. 272.

On April 22 and 27, 2010, Clark protectively filed his applications for Disability Benefits.

On June 11, 2010, Clark returned to Dr. Nguyen.  Clark reported that he had stopped taking Valium and Dilaudid and had begun taking Aleve instead.  Dr. Nguyen administered an epidural steroid injection in Clark's lumbar spine.  R. 346.

Later that day, Clark saw psychologist Dr. Frank Froman, Ed.D.  R. 295-97.  Dr. Froman assessed Clark with a major depressive disorder—moderate in severity.  Dr. Froman gave Clark a GAF score of 56 and concluded:

> CONCLUSIONS:  Steven's back has truly compromised his psychological functioning.  Were it not for this, he would easily be able to perform one or two step assemblies at a competitive

rate.  He is still able to relate adequately to others, understand oral and written instructions and manage benefits.  He is able to withstand whatever form of work his body will allow him to perform.

That said, he has worked intensively with others, and is continuing his search for better quality pain management, hoping ultimately to be able to return to a level of functioning that he can now not enjoy.

R. 297.

On August 21, 2010, Clark saw Dr. Raymond Leung, M.D.  R. 366-71.  Clark reported that he had lower back pain but that the epidural injection and physical therapy helped some.  Dr. Leung observed that Clark did not use a cane, that Clark walked with a mild to moderate limp and a slightly slow gait. Dr. Leung reported that Clark could walk fifty feet unassisted; that Clark could "tandem walk," "heel walk," and "toe walk"; that Clark refused to attempt to hop or squat; that Clark had decreased range of motion in his lumbar spine; that straight leg testing was positive bilaterally; and that Clark had normal strength in his extremities.  Dr. Leung observed no spasms or atrophy.  R. 366-68.

On September 7, 2010, Dr. Lenore Gonzalez, M.D., prepared a "Physical Residual Functional Capacity Assessment."  R. 372-79. Dr. Gonzalez opined that Clark could lift twenty pounds

occasionally and ten pounds frequently; could stand and/or walk for six hours in an eight-hour workday; could sit for six hours in an eight-hour workday; and should never climb ladders, ropes, or scaffolds.  Dr. Gonzalez opined that Clark had no other physical functional limitations.  R. 372-79.

On October 12, 2010, Clark saw Nurse Practitioner Julie Barry, CNP, complaining of back pain.  On examination, Nurse Barry determined that Clark had full range of motion in his extremities; that his gait was steady and unassisted; that his low back was tender to palpation; that his straight leg testing was positive; that his left leg was weaker than his right; and that he exhibited pain in all directions with movement of the lumbar spine. R. 386-87, 392-93.  Nurse Barry planned to change Clark's medications and refer him to a pain clinic.  R. 387, 393-94.

On December 11, 2010, Clark completed a "Function Report" form.  R. 228-35.  Clark reported that he was in constant pain; that he did not cook because he could not stand or lift; that he loaded the dishwasher and put away clothes in his home, but that these activities took a long time because he had to rest every five minutes; that his fiancée did most of the housework and cooking; that he

had difficulty dressing himself; that he did not drive because of his medications; that, when he went to the grocery store with his fiancée, he leaned on the shopping cart to walk around the store; that his back pain and depression affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs; that his condition affected his memory, concentration, and ability to complete tasks and to get along with others; that he could walk half a block before he would need to rest for thirty minutes; that he could not pay attention because of his pain medications; that he followed written instructions "very well," but not oral instructions because his medications affected his memory; and that to walk he used a cane that was prescribed in December 2010.  R. 228-35.

On January 20, 2011, Clark again saw Nurse Barry for continued back pain and muscle spasms.  Nurse Barry prescribed Cymbalta after observing that Clark's gait was steady and that Clark was using a cane.  R. 399, 500.

On January 28, 2011, agency physician Dr. Henry Rohs, M.D., completed an "Illinois Request for Medical Advice" form.  R. 395-97. Dr. Rohs reviewed the medical records and reaffirmed the opinions

recorded in Dr. Gonzalez's September 7, 2010 "Physical Residual Functional Capacity Assessment."  R. 396.

On February 9, 2011, Clark saw licensed clinical social worker Claudia Lasys for an individual therapy session.  Lasys noted that Clark was "minimally motivated with this process."  Lasys gave Clark a GAF score of 50, noting, "The patient does look as though he has succumbed to his level of pain, that he is very focused on this level of pain, [and on] his inability to physically get around or to do much.  Unfortunately, this young man has isolated himself on many levels."  R. 401.

On February 18, 2011, Dr. Nguyen noted that epidural steroid injections had helped temporarily, but that Clark's pain had returned.  Dr. Nguyen prescribed water therapy and pain medications.  R. 402.

On March 16, 2011, Clark reported to Lasys that he had not done well with his prescription for Cymbalta.  Lasys reported that Clark presented with a depressed mood.  R. 503.

On March 17, 2011, Clark reported to Dr. Nguyen that his pain remained the same; that he was taking Percocet and ibuprofen; and that he wanted to have surgery but that no one

would perform surgery because he did not have insurance.  R. 422.

Dr. Nguyen administered an epidural steroid injection in Clark's

lumbar spine.  Dr. Nguyen noted:

> I think with this particular gentleman I have done procedures, very aggressive epidural steroid injection, and also pain medications and really he has not improved at all.  He does have a herniated disc, but what it looks like on the MRI and what his symptoms are do not correlate.  I think there is a lack of motivation as well.  It is really hard to say, but he just does not push herself (sic) as much as I would like to see him help himself.
>
> He is also applying for disability so that could be part of the problem as well.
>
> I think we really need to have him see a neurosurgeon to see if this something that can be surgically fixed. . . . At this rate, had not been doing any better since he has been here.  He is just going to be miserable, but I do not know how to change that at all.  We really have been working hard with him.  One visit he could be really good, doing well and active and the next could be horrible.  I think a lot of that is his mood.  He does not do much as far as activities so I do not think that there is activity that is causing discomfort.  I think it is lack of activity and his depression that is currently not under control.

R. 424.

> On March 30, 2011, Clark again saw Lasys, who reported:
>
> MENTAL STATUS:  Patient presented in session and it looks like he is getting around a little bit better with his cane.  His affect is much brighter, not so restricted.  He is pleasant and cooperative during our session.  He indicates that depression waxes and wanes, although his pain has been reportedly at 3-4 on a scale of 1-10, which is dramatically decreased.

R. 433.

On March 15, 2011, Clark's fiancée Meliss Shields completed a questionnaire. Shields reported that she had lived with Clark for six years; that Clark was in constant pain and was unable to sleep because of it; that Clark used a cane to help with his balance; that Clark could walk for five to ten minutes, stand for five minutes, and sit for an hour; that Clark could lift three to four pounds with one hand and seven to eight pounds with both hands; and that Clark could bathe himself and care for his personal hygiene but that activities such as bathing took longer than normal because of the pain; and that Clark was "constantly irritable and depressed and tends to be short with people." R. 248-49.

Also on March 15, 2011, Clark's mother Shirley Clark completed a similar questionnaire. Clark's mother stated that Clark could not work because of severe depression and pain; that Clark had pain in his back, hips, and legs; that Clark was "very moody" because of the pain; that Clark used a cane to walk; that Clark could walk for five minutes, stand for five minutes, and sit for five minutes at a time; that Clark could lift five pounds with one

hand and ten pounds with both hands; that Clark had difficulty getting in and out of the bathtub and up from sitting on a toilet; and that Clark was irritable and sometimes lashed out.  R. 252-54.

On May 26, 2011, Clark reported to Nurse Barry that he "got into it with the Pain Clinic" and that he had stopped taking the pain medication prescribed by Dr. Nguyen and was taking only ibuprofen or Aleve.  Nurse Barry noted that Clark walked without a cane and that his gait was steady and upright.  R. 441.

On June 22, 2011, Clark reported to Lasys that he had a consultation scheduled with a neurosurgeon.  Lasys noted that Clark "offered no concerns with regard to depression or anxiety at this point in time," writing that Clark "appears to be holding his own in terms of mood management and pain management as well." R. 442.

On July 28, 2011, Clark reported to Nurse Barry that his back was the same; that he was only taking ibuprofen for pain; that he continued to use a cane to walk; and that he was having difficulty sleeping and slept one or two hours at a time.  Nurse Barry prescribed fluoxetine and baclofen.  R. 443.

On September 8, 2011, Clark reported to Nurse Barry that he had less muscle cramping and improved mood; that he was able to fall asleep, although his pain kept waking him up; and that he continued to use a cane for walking.  Nurse Barry scheduled Clark for a neurological examination.  R. 511.

On November 8, 2011, Clark reported to Nurse Barry that he was doing better because his family situation had improved; that he had more pain but was "dealing with it"; that he was taking ibuprofen and baclofen for pain and muscle spasms; and that he was taking doxepin as needed to help him sleep.  R. 446.

On November 10, 2011, Clark underwent EMG and nerve conductions studies of his back.  The studies showed left S1 radiculopathy "which appears to be subacute and chronic."  The tests showed no evidence of mononeuropathy, lumbosacral plexopathy, or peripheral neuropathy.  R. 477, 547.

On January 18, 2012, Clark reported to Nurse Barry that he had increased pain in his left leg and numbness and tingling in his right leg.  On examination, Clark's right, upper lumbar spine was tender to palpation; straight leg testing was positive at 30 degrees on the left and at 60 degrees on the right; and Clark had pain with

bending forward, left and backward.  Nurse Barry observed tightness along the musculature on the right side of the lumbar spine, and that Clark was using a cane "somewhat for ambulation." R. 515.

On January 20, 2012, Clark underwent an MRI of his lumbar spine.  The findings were mild disk disease at the L5-S1 level, unchanged from the last MRI.  R. 544.  The radiologist also noted that a small left paracentral disk protrusion abutted the S1 nerve root but did not compress it.  The radiologist found normal spacing from T12 to L5.  R. 544.

On January 26, 2012, Clark went to the emergency room complaining of back pain.  He rated the pain as 10 out of 10.  On examination, the emergency doctor found "no joint pain, swelling, warmth, erythema, stiffness.  No muscle spasm or fasciculations." Clark received prescriptions for prednisone and for hydrocodone. R. 555, 561.

On February 1, 2016, Clark reported to Nurse Barry that he had increased back pain on the left side of his back down to his left buttock and increased pain at the center of the lumbar spine.  On examination, Clark was tender with palpations on his lumbar spine,

and straight leg testing was positive.  Nurse Barry prescribed Diclofenac in place of ibuprofen; told Clark that he could continue taking hydrocodone for pain; advised Clark on the use of heat and ice; and offered physical therapy, which Clark declined.  R. 561.

On February 9, 2012, Clark reported to Nurse Barry that he was having less pain but that he still had some tenderness.  R. 563.

On March 7, 2012, Clark reported to Nurse Barry that his back pain was somewhat better.  Nurse Barry noted that Clark used a cane for walking and that Clark's posture was more upright and steady.  R. 565.

On May 23, 2012, Clark reported to Nurse Barry that he had received an epidural steroid injection on April 25, 2012, but that it did not relieve his pain.  He reported that his pain had increased over the past week and rated his pain 7 out of 10.  Nurse Barry noted that Clark's condition had "been found to be nonsurgical."  R. 567.

On July 5, 2012, Clark reported to Nurse Barry that "he has been pretty good" and rated his pain 6 out of 10.  Nurse Barry noted, "He is using a cane for ambulation.  Gait is steady.  He exhibits full strength in his lower extremities."  R. 525.

On August 8, 2012, Clark met with a neurosurgeon, Dr. Todd McCall, M.D.  Dr. McCall noted that Clark had an antalgic gait and used a cane; that Clark had full range of motion in all extremities, neck, and lumbar spine; and that Clark's MRI scan showed some degenerative changes in his spine, some arthritis, and some disk bulging, but no clear nerve compression.  Dr. McCall opined that Clark was not a good candidate for back surgery and that he did not see "any surgical pathology at this time with his spine."  R. 533.  Dr. McCall ordered a bone scan to identify any arthritis "that we may be able to treat with conservative treatments."  R. 533.

On August 15, 2012, Clark underwent a bone scan and whole body scan.  The results were largely normal, with "minimal degenerative change at the knee with increased activity."  R. 543.  The radiologist noted, "There is no focal increased activity within the lumbar spine to account for the patient's back pain."  R. 543.  Later that day, Clark met with Nurse Barry, who noted that the neurosurgeon had opined that Clark's condition was nonsurgical.  On examination, Nurse Barry observed that Clark's gait was "upright, steady and unassisted."  Nurse Barry directed Clark to reduce his use of hydrocodone to not more than two tablets daily.

She prescribed Tramadol for Clark to use for "lesser pain" while reserving his use of hydrocodone "only for pain that is not relieved with the Tramadol or very severe pain." R. 527.

### B.   Clark's administrative hearing

On August 16, 2012, the Administrative Law Judge (ALJ) held an evidentiary hearing.  R. 35-72.  Clark appeared in person with his attorney.  Vocational expert Dr. Jeffrey Magrowski, Ph.D., appeared by telephone.  R. 37-38; see R. 106-08.  The ALJ left the record open to August 30, 2012, to allow Clark to submit additional material.  R. 39.

Clark testified that he was divorced; that he lived with his fiancée; and that he had two sons, ages 14 and 10, who did not live with him.  R. 41.

Clark testified that he had constant stabbing pain in his back; that the slightest activity aggravated his pain; that he could sit in a chair for five minutes before he needed to shift positions; that he could stand for two minutes; that Dr. More recommended using a cane because he was experiencing falls; that he had been falling because he had pain in his legs and weakness in his knees; that he could walk for two minutes; that he had to shift positions

constantly between sitting, standing and lying down; that he would lie down two-thirds of the time.  R. 43-44.

Clark testified that he had no medical insurance, but that he could receive water treatment and surgery if he had insurance.  R. 44-45.

Clark testified that he experienced muscle spasms in his lower back five to six times a day; that experienced spasms with the "slightest of activities or sometimes no activity at all"; and that the spasms lasted for hours.  R. 45.

Clark testified that his pain ran down his legs "through my buttocks down to the back of my knees"; that the pain in the left leg was worse than the right and that he felt more numbness in his right leg; that the pain in his left leg was "intense pain, shooting down to the back of my knee"; that he could lift a couple of pounds; and that his cane was the heaviest thing he could pick up on a regular basis.  R. 45-46.

Clark testified that he took hydrocodone and Tramadol for the pain; that the medications took "the edge off the pain"; that a few hours after taking the medication, the pain became unbearable, but remained constant; that the hydrocodone caused confusion,

forgetfulness, drowsiness, and nausea; that he regularly napped for twenty to thirty minutes beginning some time from 4:00 p.m. to 5:00 p.m.; and that he did not drive because of the medications, pain, and muscle spasms.  R. 46-47.

Clark testified that the pain caused depression: "Well, it's, it's robbed me of the life I used to have.  I, I can't do things with my children like I used to.  I can't support my family like I used.  It just, it's caused some serious depression."  R. 47.

Clark testified that he took Amitriptyline and Doxepin to help him sleep; that the medication allowed him to sleep five hours a night; that he could not sleep longer than five hours a night because of his pain; and that the medication made him feel groggy in the morning.  R. 48.

Clark testified that he could not bend at the waist or squat because of his pain, and that he avoided climbing stairs because he had previously fallen down the stairs.  R. 48.

Asked why he walked out of the session with Dr. Nguyen in April 2010, Clark testified that he had thought the session was just for an initial consultation and had gotten scared when Dr. Nguyen immediately wanted to give him the epidural injection.  R. 49-50.

Clark testified that he had had a total of five epidural steroid injections; that the injections helped with stiffness in his back; that that the effects of the injections lasted only about a month; and that he had reduced his pain medications to two Vicodin per day.  R. 50.

Clark testified that he used to walk for exercise three times a week, but that he stopped in the summer of 2011 because, "It just became too hard for me."  R. 50.  Clark testified that currently he walked, "Maybe five minutes here, two minutes there," and that he exercised ten minutes a day by performing back stretching exercises that his doctors had given him.  R. 51.

Clark testified that he generally did not leave the house: he had left the house for a haircut a week and a half before the hearing and had left the house three weeks before the hearing to go to his mother's house, but otherwise, Clark testified, he stayed home.  R. 52.

Asked why he had money for cigarettes, but not for water therapy, Clark testified that he did not buy his own cigarettes.  R. 54.  Asked about Dr. Nguyen's March 17, 2011 note stating that Clark's symptoms did not correlate with the MRI results and that Clark lacked motivation and did not push himself, Clark responded,

"I believe she [Dr. Nguyen] expected more out of me, Your Honor, than I could give."  R. 54.

Asked Clark about his consultation with Dr. McCall, Clark testified, "He [Dr. McCall] told me that based on my financial situation there was nothing he could do for me and they just did a bone scan, he ordered a bone scan for me, and he's thinking that it could be arthritis."  R. 55.

The ALJ conducted the following inquiry about Lasys's March 30, 2011 note that Clark's pain was "dramatically decreased" and was 3-4 on a scale of 1-10:

> Q . . . Your pain has dramatically decreased they indicated. No?  Yes?"
>
> A     No, Sir.
>
> Q     So, they're trying to report what you told them.  So, did— are they reporting it wrong?
>
> A     I have good days and bad days.  It could be that that was on a good day.

R. 55-56.

Asked about his use of a cane, Clark testified that the cane helped with his balance.  Asked whether he received a prescription

for the cane, Clark testified that Dr. More had recommended that he use a cane or an umbrella.

Asked about his college attendance, Clark testified that he could only take one class at a time because he could not stand to stay for a second class because of the pain; that he was allowed to bring a pillow to class and to lie down during classes in the back of the classroom; and that he was able to take notes, conduct research, and complete assigned homework.  R. 62-63, 65.

Vocational expert Magrowski testified regarding the categories of jobs listed in the Department of Labor's Dictionary of Occupational Titles that corresponded to Clark's prior work.  R. 65-67.  The ALJ asked Magrowski the following hypothetical question:

> Hypothetical one, assume an individual of the claimant's age, education and work experience who is limited to the full range of light exertional work, as defined in the regulations, limited to frequent climbing of ramps and stairs; no climbing of ladders, ropes or scaffolds; occasional balancing; frequent stooping; occasional kneeling, crouching and crawling.  Such an individual must avoid moderate exposure to hazards, such as operational control of moving machinery and unprotected heights.  Such an individual is limited to simple routine and repetitive tasks and limited to no more than occasional changes in the work setting with no production rate or pace work, that is no strict or fast paced production requirements, although competitive production requirements would still exist and limited to no interaction with the public.  Could such an individual return to any of the past work you've testified to?

R. 67.

Magrowski opined that such a person could perform the housekeeping job that Clark had performed at the veterans' home; that such a person could also perform additional jobs such as bakery products racker (200 jobs in the area, 15,000 in the national economy); garment or clothing bagger (1,000 jobs in the area, 50,000 in the national economy); and laundry worker (1,000 jobs in the area, over 20,000 in the national economy).  R. 64-68.

### C.   The Administrative Law Judge's decision

The ALJ issued his decision on October 22, 2012.  R. 16-29. The ALJ followed the five-step analysis set forth in the Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d),

416.920(d).  To meet the Step 3 requirement, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  At Step 5, the Commissioner has the burden of showing that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Clark met his burden at Steps 1 and 2: Clark had not engaged in substantial gainful activity since November 15, 2009, and Clark had severe impairments from major depressive disorder, left S-1 radiculopathy, chronic low back pain with disc bulge and nerve root encroachment.  R. 18.  At Step 3, the ALJ found that Clark did not have an impairment or combination of impairments that met or medically equaled a Listing.  R. 19.

At Step 4, the ALJ found that Clark had the RFC to perform light work, except that he was limited to: frequent climbing of ramps and stairs; no climbing of ladders, ropes, and scaffolds; occasional balancing; kneeling, crouching, and crawling; frequent stooping; moderate exposure to hazards such as operational control of machinery and unprotected heights; simple, routine, repetitive tasks; occasional changes in the work setting; no production rate or pace work; and no interaction with the public.  R. 21.  The ALJ relied on the MRIs, X-rays, EMG and nerve conduction study, and the bone scan that showed relatively minor back problems; the treatment notes by Dr. Nguyen about lack of effort; Clark's report to Lasys in March 2011 that his pain had lessened; the lack of significant psychiatric treatment (only a few sessions with licensed

clinical social worker Lasys); Dr. Froman's opinion; Dr. Leung's examination; and the opinions of Drs. Gonzalez and Rohs in formulating the RFC.[1]  The ALJ found greater restrictions on positional activities of balancing, kneeling, crouching, and crawling than those found by Drs. Gonzalez and Rohs.  R. 27.

The ALJ found that Clark's testimony about the severity of his pain was not credible because it was not consistent with this medical evidence.  R. 25-26.  The ALJ also rejected the written statements by Clark's girlfriend and mother about his activities. The ALJ found that their opinions about Clark's functional abilities were not well supported by the other evidence in the record.  R. 27.

At Step 4, the ALJ found that Clark could not return to his prior work.  The ALJ relied on the RFC determination and the testimony of vocational expert Magrowski.  R. 27-28.

At Step 5, the ALJ found that Clark could perform a significant number of jobs that existed in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and Magrowski's testimony.  The ALJ found

---

[1] The ALJ did not refer to Drs. Gonzalez and Rohs by name.  Rather, he referred to them as State Agency Physicians and cited reference numbers to their reports in the record, 8F and 11F.  R. 27.

that Clark could perform the representative jobs of bakery racker, bagger, and laundry worker.  R. 28-29.  The ALJ, therefore, found at Step 5 that Clark was not disabled.  R. 29.

Clark appealed.  On January 8, 2014, the Appeals Council denied Clark's request for review.  The decision of the ALJ then became the final decision of the Commissioner.  R. 1.  Clark then brought this action for judicial review.

## III.   Arguments on appeal

On appeal, Clark argues that the ALJ's findings were not detailed enough and that the ALJ failed to consider all the relevant evidence.  The Magistrate Judge has disagreed, noting that the ALJ is not required to mention every piece of evidence in detail— although he must build a logical bridge from the evidence to his conclusions.  Simila v. Astrue, 573 F.3d 503, 516 (7th Cir. 2009). Here, the Magistrate Judge has found, the ALJ built such a bridge.

Clark also argues that, although the ALJ said he gave weight to Dr. Froman's opinions, the ALJ ignored Dr. Froman's comments that support a finding of disability.  The Magistrate Judge has disagreed, noting Dr. Froman's conclusion that "Steven's back has truly compromised his psychological functioning.  Were it not for

this, he would easily be able to perform one or two step assemblies at a competitive rate. . . . He is able to withstand whatever form of work his body will allow him to perform." R. 297.  Although Clark focused on Dr. Froman's first statement that Clark's back problems "truly compromised his psychological functioning," the last sentence of Dr. Froman's conclusion opines that Clark could "withstand whatever form of work his body will allow him to perform." R. 297.  The Magistrate Judge has found that the ALJ properly relied on this final conclusion from Dr. Froman that Clark could do any job his body would allow him to perform.  The ALJ had relied on the psychologist, Dr. Froman, for the conclusion that Clark psychologically could withstand such work, while properly looking to the medical evidence to determine the type of work that Clark could perform physically.  Indeed, the ALJ further limited the RFC to reflect some psychological limitations noted by Dr. Froman.  Thus, the Magistrate Judge has found, the ALJ did not err in his consideration of Dr. Froman's opinions.

Clark also argues that the ALJ erred in his credibility determination.  The Magistrate Judge has disagreed, noting that the Court will not review the ALJ's credibility determinations unless the

determinations lack any explanation or support in the record.

Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008). This case, the Magistrate Judge has found, is fundamentally about Clark's credibility, and the ALJ simply disbelieved Clark's claims about the debilitating level of his pain, citing extensive evidence to support his conclusion. The ALJ cited the MRIs, x-rays, the EMG and nerve conduction study, and the bone scan that showed a condition that would not normally cause the claimed level of pain; Dr. Leung's examination showing that Clark could walk unassisted and had normal strength and range of motion in his extremities; Dr. Nguyen's observations that the results of the MRIs did not correlate with Clark's claims of pain; the fact that Clark reported to Lasys that his pain was dramatically decreased in March 2011 to a 3-4 out of 10; Dr. McCall's surgical consultation results in which he observed full strength and range of motion in all Clark's extremities; Dr. McCall's conclusion that Clark did not have any surgical pathology[2]; and Dr. Froman's opinion that Clark could stand the

---

[2] Clark testified that Dr. McCall did not recommend surgery because of Clark's finances. R. 55. This testimony is inconsistent with Dr. McCall's notes. The notes state that Clark was not a good candidate for back surgery because Dr. McCall did not find any surgical pathology. R. 533. Dr. McCall's notes do not support the contention that Clark's lack of insurance affected Dr. McCall's decision to recommend against back surgery.

psychological stress and requirements of work.  R. 23-26.  In the Magistrate Judge's view, there is no reason to disturb the ALJ's credibility finding.

Finally, Clark argues that the ALJ erred by not giving any weight to Dr. Nguyen's notes from Clark's initial visit that Clark could lift ten pounds occasionally, had GAF of 45, and could not work.  The Magistrate Judge has disagreed, finding that Dr. Nguyen's statement that Clark could lift ten pounds occasionally and could not work reflected the information Clark provided at the initial visit, not an assessment by Dr. Nguyen.  Dr. Nguyen's later comments on March 17, 2011, about Clark's condition, quoted above, more accurately reflect Dr. Nguyen's opinions as a treating physician.  See 20 C.F.R. §404.1527(c)(2)(i) ([T]he longer a treating source has treated you . . . the more weight we will give to the source's medical opinion).  The ALJ considered and gave weight to these later assessments, the Magistrate Judge has found.  See R. 24.

The Magistrate Judge has also found that the ALJ did not err in failing to give weight to Dr. Nguyen's GAF Score of 45, noting that Dr. Nguyen is a pain management expert, not a psychiatrist or

Page 31 of 39

other mental health care professional, and that the record contains
no evidence indicating that he was qualified to render opinions on
Clark's mental health.  R. 334.[3]  Further, a GAF score does not
reflect a clinician's opinion on functional capacity.  Rather, the
score is an assessment of both severity of symptoms and functional
capacity.  The final score "reflects the worse of the two."  <u>Denton v.
Astrue</u>, 596 F.3d 419, 425 (7th Cir. 2010) (quoting American
Psychiatric Association (APA), <u>Diagnostic and Statistical Manual of
Mental Disorders (Text Revision, 4th ed. 2000) (DSM-4)</u>, at 33).  The
GAF score, therefore, may or may not indicate a person's functional
limitations.  <u>Id</u>.  And this inherent ambiguity may explain the APA's
decision to drop the GAF score from its current diagnostic manual,
the DSM-5:

> It was recommended that the GAF be dropped from DSM-5 for
> several reasons, including its conceptual lack of clarity (i.e.,
> including symptoms, suicide risk, and disabilities in its
> descriptors) and questionable psychometrics in routine
> practice.

---

[3] It is unclear whether Dr. Nguyen was giving a GAF score used by psychologists and
psychiatrists.  Dr. Nguyen referred to a "Functional Ability Score" of 45.  R. 433.  Dr. Nguyen
did not refer to "GAF" or "Global Assessment of Functioning" score.  Dr. Nguyen may have been
giving some other assessment score.  The ALJ, however, treated the score as a GAF score.  R.
23.  Clark does not dispute the ALJ's conclusion that Dr. Nguyen was assessing a GAF score.
See Clark Brief, at 6.

APA, <u>Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5)</u>, at 16.  In light of this, the Magistrate Judge has found no error in the ALJ's decision not to consider a GAF score given by a pain management specialist rather than a mental health specialist.  The ALJ did not ignore Dr. Nguyen; he gave weight to Dr. Nguyen's March 2011 observations, made after several sessions with Clark.  R. 24.

In sum, the Magistrate Judge has found that the ALJ's decision was supported by substantial evidence, and that the ALJ's RFC determination was supported by the MRI, X-rays, EMG and nerve conduction study, and bone scan that showed a condition that would normally be consistent with RFC determination; by Dr. Nguyen's statements that Clark was not trying and by Clark's statement to Lasys that his pain was a 3-4 on a scale of 1-10; by the opinions of Drs. Gonzalez and Rohs; and by the consultative examinations of Drs. Leung and Froman.  The Court sees no error in the Magistrate Judge's finding.

## IV.  Objections

Clark has filed objections (d/e 18) to the Magistrate Judge's Report and Recommendation.  Clark argues that, in building a

logical bridge from evidence to conclusions, the ALJ cannot cite only evidence that supports the bridge while "ignoring all evidence that would cause the bridge to crumble" (d/e 18 at 1). Here, Clark argues, the Seventh Circuit has recognized that pain can be "severe and disabling" even "in the absence of 'objective' medical filings, that is, test results that demonstrate a physical condition that normally causes pain of the severity claimed by the applicant." Carradine v. Barnhart, 360 F.3d 751, 753 (7th Cir. 2004). As the Carradine court noted, "[P]ain alone can be disabling, even when its existence is unsupported by objective evidence," and the ALJ "may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." Id. (quotations omitted).

Clark acknowledges that the ALJ must be alert to the possibility that an unscrupulous claimant might exaggerate his symptoms of pain and that a reviewing court's ability to overturn a credibility determination is necessarily limited (d/e 18 at 2). Nevertheless, Clark says, the Carradine court found "serious errors in reasoning" that resemble errors made by the ALJ here. Carradine, 360 F.3d at 754. The Carradine court criticized the ALJ

for not taking seriously the possibility that the claimant's pain was as severe as alleged and caused by psychological rather than physical factors, and for failing to consider the difference between being able to engage in occasional physical activity and being able to work five 8-hour shifts per week.  Id. at 755.  Here, Clark says, the ALJ and the Magistrate Judge have both ignored Clark's numerous reports of pain, his doctors' consistently prescribing pain medication and epidural injections, and providers' notes that Clark was using a cane and having difficulty walking.

It is true that an ALJ may not "discredit [a] claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence."  Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009) (affirming denial of benefits where ALJ doubted claimant's testimony) (quoting Carradine, 360 F.3d at 753).  But as the Seventh Circuit has explained, Carradine "does not imply that an ALJ can never consider the lack of objective evidence in rejecting a claimant's subjective complaints."  Simila, 573 F.3d at 519 (emphasis in original).  Rather, the ALJ may not deny a disability claim "solely because the available medical evidence does not substantiate [the claimant's] statements."  Id. (emphasis and

alternation in original).  Instead, the ALJ must consider a variety of factors in making a credibility determination: the objective medical evidence, the claimant's daily activities, aggravating factors, types of treatment received and medication taken, and the claimant's functional limitations.  Id. at 517.  Ultimately, the ALJ "may disregard a claimant's assertions of pain if he validly finds her incredible."  Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2006) (remanding on different issue but affirming ALJ's discrediting of claimant's allegations of pain).

Here, the ALJ considered, most significantly, the objective medical evidence and Clark's functional limitations by considering: the MRIs, x-rays, the EMG and nerve conduction study, and the bone scan showing a condition that would not normally cause the claimed level of pain; Dr. Leung's examination showing that Clark could walk unassisted and had normal strength and range of motion in his extremities; Dr. Nguyen's observations that the results of the MRIs did not correlate with Clark's claims of pain; the fact that Clark reported to Lasys that his pain was dramatically decreased in March 2011 to a 3-4 out of 10; Dr. McCall's surgical consultation results in which he observed full strength and range of

motion in all Clark's extremities; Dr. McCall's conclusion that Clark did not have any surgical pathology; and Dr. Froman's opinion that Clark could stand the psychological stress and requirements of work.  The Court finds that the ALJ did not "discredit [Clark's] testimony as to subjective symptoms merely because" Clark's alleged symptoms were "unsupported by objective evidence." Simila, 573 F.3d at 517.  Rather, the ALJ properly considered the larger record in assessing Clark's credibility.  The Court does not review an ALJ's credibility determination unless it lacks any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  Here, the Court agrees with the Magistrate Judge that the record supports the ALJ's credibility determination.

Clark also objects to the Magistrate Judge's interpretation of Dr. Froman's report.  As explained earlier in this opinion, Dr. Froman wrote:

> Steven's back has truly compromised his psychological functioning.  Were it not for this, he would easily be able to perform one or two step assemblies at a competitive rate.  He is still able to relate adequately to others, understand oral and written instructions and manage benefits.  He is able to withstand whatever form of work his body will allow him to perform.

R. 297.  Clark argues that the Magistrate Judge has erred in focusing on the final sentence of the quoted paragraph.  Dr. Froman's opinion, Clark says, stands for more than the proposition that Clark could psychologically withstand work.  The evidence shows, Clark says, that Dr. Froman did not view Clark as a malingerer, having written that Clark was "continuing his search for better quality pain management, hoping ultimately to be able to return to <u>a level of functioning that he can now not enjoy</u>."  R. 297 (emphasis added).

But as the Magistrate Judge has noted, Dr. Froman is a psychologist, and the ALJ properly relied on Dr. Froman in concluding that Clark could psychologically withstand work, while relying on the medical evidence to determine Clark's physical limitations (d/e 17 at 28).  In forming his assessment of Clark's physical limitations, the ALJ cited a substantial amount of medical evidence, described at length above.  The Court agrees with the Magistrate Judge that the ALJ did not err in his evaluation of Dr. Froman's opinion.

## V.   Conclusion

For the reasons above, Plaintiff's Objections (d/e 18) to the Magistrate Judge's Report and Recommendation are DENIED.  This Court ADOPTS the Magistrate Judge's Report and Recommendation (d/e 17) in full.  Plaintiff's Motion for Summary Judgment (d/e 10) is DENIED and Defendant's Motion for Summary Affirmance (d/e 15) is GRANTED.  The decision of the Commissioner is AFFIRMED.

ENTER: February 17, 2016

FOR THE COURT:

            s/Sue E. Myerscough
        SUE E. MYERSCOUGH
    UNITED STATES DISTRICT JUDGE